Thank you, Your Honor. My name is Brian Charles Tipp. I'm from Missoula, Montana. I, together with the people seated at the council table with me, Ms. Robin Ammons and Mr. Richard Bewley, represent Douglas Jensen in this appeal. Are you going to allocate time between yourselves? Yes, we are, Your Honor. I want to let the Court know that our plan is to bifurcate the argument between the sentencing issues and the search and arrest issue. And I'd also like to reserve at this time five minutes rebuttal. Since I don't know what issue is most important to the course consideration here, I guess I'm just going to forge forward, leaving some time for Mr. Bewley to address the other issue. If the Court wants to get to that sooner, certainly let me know. You control the time, whatever. As long as, between all of you, it's no more than 20 minutes, you can do anything you like. That's understood. Thank you, Your Honor. Your Honor, this case really begins with the arrest of Douglas Jensen in a fashion that is outlined in the briefs that we have here is totally contrived. No dispute about that whatsoever from any of the parties, from the government, from anyone involved, not even the officers. And ultimately, because of the officers saying he was arresting Mr. Jensen for the offense of reckless driving, that issue was brought before the district court. It was fully briefed by the government and by the trial counsel. And the judge, Judge Malloy, essentially turned the entire issue around to a question of whether or not the officers, notwithstanding the fact they had never considered that they had probable cause to arrest Mr. Jensen, the trial court determined that, in fact, they had probable cause to arrest Mr. Jensen for a drug offense. Well, now, wait a minute. Let's take it step by step. There certainly was, I would have to concede, reasonable suspicion to make the stop in the first place. Your Honor, I think that was conceded at the trial level. All right. Okay. So the stop is valid. The stop is valid. All right. Take it from there. The question really is the arrest. The officers who were on the scene, Officer Geno Cook was the primary person who made the initial detention, held Mr. Jensen for a period of time on this piece of property off of the highway. He waited there until the officers from Flathead County appeared, at which time he relinquished the entire investigation and scene over to those officers. It was only when those officers made a determination that they weren't going to arrest Mr. Jensen that Officer Cook said, well, no, we can't stand for that. He had in his mind from the beginning, okay, we can arrest Jensen. Once we arrest him, we can impound the vehicle. We're going to get a free look at this vehicle because we can get him arrested. When the Flathead County officers who actually have jurisdiction make the determination, lookit, there isn't an offense for which we are going to arrest here. This is careless driving. There's no DUI. There's no reckless driving. We are not going to make an arrest. It's at that point in time that Officer Cook really begins a series, making a series of decisions which are, well, they're interesting to say the least. First thing he does is he contacts the city of Kalispell where the call had initiated, notwithstanding the fact that Flathead County was there, notwithstanding the fact Flathead County had jurisdiction. He informs the Kalispell city people, look, I have Mr. Jensen here. We had this call. He doesn't tell them that the Flathead officers are there, doesn't tell them that Flathead officers have determined they wouldn't make an arrest, but we're going to cite and release. And he simply says, you know, I'd like to arrest him. Can I arrest him? And he gets permission to do that. Then, instead of the problem, he got permission to arrest him for a suspected drug offense. No, he did not. He got permission to arrest him for reckless driving, not for any suspected drug offense. So at that point in time, instead of, as the Flathead officer testified, he was supposed to bring Mr. Jensen immediately to this meet between Kalispell and Whitefish. Instead, he takes Mr. Jensen entirely the opposite direction, 15 miles out of the way, not towards Kalispell, 15 miles the other direction. And he holds him there incommunicado with the express purpose and intent of getting the drug dogs there so that they could get the drug dog to hit on the car. By this point in time, they'd already impounded the vehicle. Now, I guess really the issue here is what Judge Malloy's decision was. Judge Malloy decided that in this particular case, that even though, number one, Officer Little did not have the legal authority under Montana law to make the arrest, and even though, number two, there wasn't a basis for him to be arrested for reckless driving since the Flathead County officers had jurisdiction, nevertheless, there was probable cause to believe that Mr. Jensen at that moment had drugs in the car and was committing an offense. That was the basis of the district court's determination here. We respectfully urge that as laid out in the briefs in this particular case, that's just not the case. Now, in order to get to that, Judge Malloy does a couple of different things. He says, okay, you've got Geno Cook at the scene. You have Officer Meehan at the scene. The only thing we know from the testimony between those two is that Officer Cook calls Officer Meehan and says, hey, it looks like they're going to pull Doug Jensen over. Do you have anything on him? And Officer Meehan says, I didn't know he was back from Mexico. That is the sum total of the testimony in the record indicating what transpired between those two officers. Can I stop you? Yes. If he had the authority to stop him but not necessarily to arrest him for reckless driving, and if there were probable cause for drugs, would you agree that the authority issue would go out the window? If there were probable cause to believe that Mr. Jensen, at that moment where he stood, was committing the offense of some drug offense, presently committing that offense. Okay. So then the problem becomes. Yes. I would agree that he has authority. The problem becomes how to read these Ninth Circuit cases about imputed knowledge. Because Sergeant Cook, all he says is he has intelligence. So that's not enough to arrest anybody. I'd agree with that. And then the next guy, Meehan, is that his name? Meehan. Meehan says he's back from Mexico, and then it's actually the third gentleman, McCarville, who has specific knowledge, correct, about, oh, well, at least ostensibly from an informant about a problem and that he was going to be transporting drugs up north. I think that generally states the case. Is there any evidence that McCarville communicates with either of the other gentlemen during this on-the-ground situation? Zero evidence of it. There's no evidence that McCarville is even involved in this in any way whatsoever. McCarville doesn't show up until we get to the issue of the warrants, which are obtained a long time after that. We have no idea if or when McCarville ever transmitted that information to Meehan or to Cook. We don't know when that happened, except that it had to have happened sometime prior to the affidavit for the search warrant. McCarville is nowhere at the scene. There's no indication that, for instance, there was, if you look at the collective knowledge cases, and specifically at Bernard, in that particular case, there was a briefing that had taken place earlier in the day saying we have this information about this individual. No evidence in this particular case any such thing occurred. One question, then, is about the black station wagon. I'm sorry? The black station wagon. Yes, ma'am. Did Detective Meehan think that your client had done some illicit drug activity in a black station wagon? Was that known at that moment? If Meehan knew that, it wasn't made part of the record, no, Your Honor. In fact, I think probably the most salient fact here is that neither of these very experienced drug officers, at least one of them, Geno Cook, who had been on the Northwest Drug Task Force for a period of three years, neither he nor Officer Meehan ever considered that collectively they had sufficient probable cause to make an arrest for a drug crime. Neither of them even considered it. The government didn't even consider it. It wasn't until the district court brought the evidentiary hearing to a conclusion that that was even an issue, and it wasn't until we had the order, or from what I can tell from the record since I wasn't there, until they had the order. So it was predicated on the reckless driving in terms of the, quote, illegitimate arrest. Yes. All the way up until then. Now, I do want to take a moment. Pardon me, Counsel. Didn't Cook recognize as a result of the intelligence that he received through the Northwest Drug Task Force in December 2002 and January 2003 before the arrest that Jensen's car was a 1987 black Ford Tower Station wagon? I believe that the record does make out that. Cook knew that from his intelligence information in the Northwest Drug Task Force before the arrest that Jensen was involved in drug running and that he had a black Taurus 1987 car, exactly the same one that was speeding 75 in a 25 farther south, right? I think it would be fair to say that Cook knew prior to him even stopping the vehicle, stopping Mr. Jensen's vehicle, he knew, number one, that there was some sort of talk where intelligence is never really defined regarding Mr. Jensen through the Northwest Drug Task Force, and two, that Mr. Jensen drove a black station wagon. I believe that is true. Yes. Because at excerpts of Record 44, we have a source informing the police that Jensen planned to go to Nevada, California area to obtain a large amount of methamphetamine on January 21st, about a month before the arrest. Give me one moment, Your Honor. You're looking at the application for the search warrant. You're talking about and you're looking at excerpts of Record page 44, Your Honor. Yes. Correct. Meehan had received some information that had been uncorroborated prior to making the arrest. Obviously, this is prior to making the arrest. He had received some information. None of that information had been corroborated by Meehan, and there's nothing within the record to show that the information held by McCarville was ever provided to Meehan prior to the arrest either, which through multiple independent informants might provide possible corroboration. There's no evidence to make that connection. I have the impression that the evidence from the informant had been shared with the Northwest Task Force, including Sergeant Cook. Which certainly not the stuff that Officer Meehan had, because Officer Meehan, excuse me, Officer Cook was not with the task force when Officer Meehan was. So whatever information Meehan had obtained from the Northwest Drug Task Force, he obtained after Officer Cook had left the task force. And as far as the information that McCarville had, there's no indication prior to the affidavits for the warrant that any of that information was shared among any of them prior to the arrest. Counsel, you've got less than seven minutes. Yes. Did you want to share time with someone on the constitutionality issue? It's up to you. I would like to do that. I would like to pass off to Mr. Buehle now to raise or discuss with the Court the issues of the sentence. Thank you, Your Honor. Thank you. May it please the Court, once again, my name is Richard Buehle for the appellant. The constitutionality question in this case highlights how short of a memory we collectively have as a society. Don't you have an uphill battle here with Mestreda, Lamont, and Crayon to deal with? I don't think we do as far as Mestreda goes, Your Honor. The reason being, in Mestreda, the opinion states that since the sentencing guideline commission was under the auspices of the judiciary, that there was no separation of powers problem. However, the opinion goes on to state that if the commission had been placed in the executive, we may be facing a separation of powers problem because then you have the prosecution and the sentencing power within the same executive. Does Booker and Fanfan affect this argument at all now that it's all not ñ it's no longer mandatory, it's now advisory? I don't think it does at all. The reason being, the sentencing guidelines were avoided in this case. And under 851, the 851 information, the mandatory maximum sentence of life in prison was given to Mr. Jensen in spite of the sentencing guidelines which would have mandated approximately a 20-year sentence. And the district judge, Malloy, specifically found that it should be under the guidelines rather than under 851 according to the facts and circumstances surrounding Mr. Jensen as well as the facts of the case. And so therefore, I don't believe that Booker applies at all in this particular situation. But what it does highlight is the problem when the discretion to file an 851 information is left solely to the prosecutor. And it's the prosecutor who determines to go outside the guidelines. And if the goal of sentencing is to have some sort of consistency, here the total arbitrary power is with the attorney general. And at the sentencing hearing as we've set forth in our brief, the reason they did so is because they could. That was the only explanation that the U.S. attorney general made, because we can't. And we don't believe that that is constitutional, and we certainly don't believe that it's just. We'll return down to about four minutes for your side. Thank you. Okay. We'll hear from the Governor. May it please the Court. Good morning. My name is Joe Thagard. I'm an assistant attorney general from or assistant U.S. attorney from Great Falls, Montana. I'm sorry, I was a prosecutor for the state in a previous life. I represent the government in this matter. I'll begin with the search and seizure issue. I think that one of the critical issues in this case obviously concerns imputed knowledge and what may be imputed to Sergeant Cook and how he may have known what he knew and when he knew it. It's important, I think, in this case to recognize that Sergeant Cook had been working on this Northwest Drug Task Force up until about a month prior to the stop and arrest of Jensen. He'd been on that task force, I believe, for a couple of years and had certainly been present when Detective McCarville was working there. One of the things that comes up, and I think that the district court relied on, in establishing the depth of Sergeant Cook's knowledge about Jensen's activities, may be found at the excerpts of records page 41 and 42. And that's a police report from Cook which described what he had done that day and sort of what he knew about Jensen's activities. It was appended to Mr. Jensen's brief in support of his motion to suppress. And in that, what we have is we have a pretty substantial recitation from Cook about just what he knew about Jensen and his activities. And in particular, what I think is clear from reading the bottom paragraph of page 41 and through the first paragraph of page 42 is that Cook was aware that this defendant was making these trips to California, to the Tijuana area, that he was bringing back substantial amounts of methamphetamine and that some of it was packed in this cayenne pepper as a means of disguising the odor. And so I think that when one looks at the excerpts of the records and looks at page 41 and 42, as I think Judge Malloy's order did, it's very clear that there was a very close working relationship here between Cook and the other members of this task force. And I think under Bernard, it's fair to impute that knowledge. Well, take it sequentially. The stop is made. Counsel concedes that there's reasonable suspicion for the stop. All right. From the moment of the stop on, bring this out for us, because I'm not quite sure I understand when Cook's imputed knowledge becomes triggered, so to speak. Is it at the very time of the stop because of his prior task force experience, or is it because of these conversations that have occurred afterward which were described in Mr. Cook's argument? I would say, Judge, that it's even before the stop. I think it begins at the moment that, you know, Cook initially is told that this car has sped through Kalispell and is headed north. And once he gets a suspicion that it's Jensen, and I think his testimony is pretty clear on this point, he's interested in Jensen not only for the reckless driving, but that he's also interested in it for drugs. And I think that his report, which is recounted at the excerpts of the record, makes that clear, that he's got this knowledge. He does do some additional stuff. He calls Meehan in particular and speaks to Meehan and addresses whether or not Meehan is aware of the activities of the defendant, what may have been going on, and that's when Meehan makes the comment that. Where is the evidence in the record that Cook's knowledge of Jensen's activities predated the stop? And, Judge, I would say that that was in page 41 and 42 of the excerpt. Isn't that a report that he makes out after the arrest? Yes, and this is the report that he makes out after the arrest. And that's after he's already talked to Meehan and McCarville. He'd spoken to Meehan at that point. There's nothing to show that he'd spoken to McCarville at that point. I guess what it boils down to, though, is he's been on the task force and he talks about intelligence, but he doesn't tell us what that is. So what he does tell us is that they know that this guy Jensen has a black station wagon and they do know that he has made trips back and forth to California for drug purposes. Is that enough to arrest him on probable cause at that moment for drugs? Judge, I don't think that that standing alone is. Okay. But I do think that that. But that's what page 41 and 42 basically tell us. Yes. So then let's go. And then if you go through all of the rest of Sergeant Cook's testimony, he doesn't add much to it. I mean, he has a lot of testimony. So then I go to Detective Meehan, and all we know from him is thought he was in Mexico, but he's not. Do we know anything else from Detective Meehan that could be substantially imputed to Cook at that point? Judge, I don't think that we can. And as I think is pretty apparent from the record here, what happened, and if it's anybody's fault, it's mine. We were really focused on the authority to arrest for reckless driving charge in this case, and I'll come to that in a moment. But what I do think 41 and 42 do is I think that they establish a close relationship between these agents. I think it certainly shows that Cook had some knowledge of his own that he brought with him from the task force. He is working with Meehan that day. He speaks with him. There's a close working relationship here. And I think that Bernard is pretty clear that one officer doesn't have to necessarily know what all the other officers know, where they're working together closely. What was the total time elapsed from the moment of the stop until the moment of the impoundment of the vehicle? It's a fairly brief period of time, Judge. I think it would be safe to say that between the time of the stop and the actual impoundment is probably less than an hour. Less than one hour? Less than one hour. Because my recollection, Judge, is that I think he is turned over to the Kalispell authorities around 11 o'clock. And I think the stop occurred about 9 o'clock. So you would agree that unless we can impute the broader task force information to Sergeant Cook, that at least what he put out on paper wasn't sufficient.  Yes, I would, Judge. So then we just have to sort through the imputation cases and figure out, because most, and you would say that simply being on the task force was enough. I think so. I think given the particular circumstances of this case, we need to recognize that we're speaking about a small police community here. You know, being on a large task force in Los Angeles or Miami may be one thing. Being in one in Montana is a considerably different one. And I think especially given the fact that he had only been on that task force relatively recently is of particular importance in this case. What is the evidence that he had some knowledge which would be sufficient to establish probable cause to arrest? Well, yeah. With his task force participation? Yes, Judge. And I think that's what Judge Malloy refers to in this particular, in his order. I guess I have two other points here. No, no. That was a question. Oh, I'm sorry. I'm sorry. It's not a crime to come back from Mexico. What was the actual knowledge that Cook possessed that would be sufficient to justify an arrest? Actual as opposed to imputed. Well, answer both, imputed and actual. All right. I would say if we take the imputed knowledge, we had the testimony from these informants that they had purchased drugs from the defendant before, that he had this routine of going to California or the Southern California area. They would purchase large quantities of methamphetamine. He would transport it back to Montana. Was it suspicion or knowledge? This was knowledge from the informants. Based on CIs. Yes, based on CIs, that he would package this in cayenne pepper, that it would be hidden in the car. And they refer, at least one of them does, to this Ford Taurus. And that these trips would typically take four to six weeks. And one of the informants had had a discussion. I can't remember if it was McCarville or Meehan in January, about mid-January, that he was on one of these trips. So that would put him in a return mode in this time frame of February 19th, which was when the stop occurred. What's a little puzzling to me is if this fellow was such a high target as far as the fast course is concerned, why wasn't he searched out and found rather than having them just sort of come into their laps the way they did? And I guess I don't have a good answer for you on that, Judge. The other thing we've argued in our briefs, I won't rehash it. I recognize Judge Molloy did not find for the government in this issue. But the government does suggest that the officer had the authority to make an arrest for reckless driving. I realize State v. Hendrickson is out there. I think it's a little different than this case, though, because in this case Sergeant Cook really was acting as an agent for this agency, the Kalispell Police Department, that had concurrent jurisdiction. And I think that's a little bit different than State v. Hendrickson. The last thing that I would point out on the search issue is, and the government has argued this, I think it's important to understand that after the arrest and impoundment of the car occurred, there was a search warrant obtained in this matter. And I think that that search warrant, even if it were excised of the very limited material which concerned the dog sniff of the car, established probable cause. And I think that that is something that needs to be looked at here. Even if the initial arrest and impoundment are found to be improper, there is this intervening factor here, and that they, before they searched the car, they went and got a search warrant from a State district judge. Yeah, but it wouldn't do you much good to have a search warrant if you didn't have the car. Well, and that's true. That's true. It's kind of a technicality, but, and so, and the only reason. So then you've got to go backwards, it seems, to like, how did you get the car? I think. I guess I'm trying to understand. I'm not sure that cleanses the prior issues, if there are prior stumbling blocks, does it? Counsel, I had a question that required. Could you answer that question first? Sure. I guess what I would suggest, when I look at the language of Wong-Sun, there are, there is some language in there about attenuation. And I'm not going to stand here and say that it's not very significant that they actually had possession of the contraband at this point. And I think we all know what would have happened to it if they hadn't had it in their hands at that point. But I do think that when we look at attenuation, getting a search warrant is an attenuating factor, and I think that that is significant. Thank you. Pardon me, Judge. With respect to the chronology, Judge Scanlon asked you, what was the actual knowledge Cook possessed of Jensen's drug dealing activities on the date of the arrest? And then you started talking about the imputed knowledge that was given to him through the informants of the Northwest Drug Task Force. But I thought that Jensen stopped working for the task force at the beginning of, at the end of 2002 and beginning of 2003, and that the information that the informants gave was after, after Cook stopped working on the task force. And some of that, if you look at the search warrant application, some of that information was actually imparted in referring to page 45 of the excerpt of the record, the big middle paragraph. It talks about a December 2002 conversation between Detective McCarvel and a citizen source. And so that would have been at the point in time that Cook was still on the task force. And this reaches Cook by imputation or osmosis, but not by actual testimony? Yes, Judge. And the final issue I'll touch on, unless the Court has any other questions about the search and seizure issue, is the sentence. Just to clarify, the actual knowledge at the stop held by Cook was what? Did he know this defendant as someone who had been trafficking, or did he simply hear the name somehow because he was one of many that the task force were interested in? He actually, he knew of him as a person. As he said, I had some intelligence on him. And again, returning to his report, he talks about what he knew in there, where he refers to, from prior experience, Sergeant Cook knew Jensen was most likely involved in the transport sale and use of methamphetamine. And then it goes on to the next page. And so he did have some actual knowledge about Mr. Jensen's participation in drug trafficking. Pre-stop, or at least as of the moment of the stop? Yes, Judge. But it's that knowledge that you said earlier is not sufficient for probable cause in and of itself. I would agree, Judge. I would agree. Turning to the issue of sentencing in this issue. First of all, is there a Booker-Fan-Fan issue here? I don't think there is. This was strictly a mandatory sentencing provision. And also it had to do with recidivism. And so I don't think it was implicated under Apprendi. Because I think Apprendi had a pretty clear exception that it carved out early on that all the courts have seemed to continue to heed that is not going to apply to enhancement for a prior criminal record. So I don't think that there is a Booker-Fan-Fan issue. But you say this is a mandatory provision. Yes. Coming out of the sentencing guidelines or in the separate statute? Coming out of the statute out of 841 and 851, Judge. Which is not subject to the guidelines. I mean, that's a separate. Yes, Judge. Yes, Judge. And again, I think that in this instance what was allowed here is really no different than any of the other discretion afforded to prosecutors. Prosecutors are given a wide latitude in determining which charges to bring, for example. I know frequently I work in cases of some of the reservations for Native Americans in Montana. We're frequently faced with circumstances where we choose between first-degree murder charges, which carry mandatory life, and second, which does not. It's simply something that's really traditionally entrusted to the discretion of the executive, and I don't see this as being anything different. And I guess the additional point is that that's to the discretion of the executive and Congress has authorized, which is a separate branch, specific sentence, correct? Yes. You have two branches at play, and then I guess the judiciary, to some degree, is a rubber stamp then. You do have two branches that are actually in active participation. And it can be frustrating, but, you know, the United States Supreme Court has held that Congress has the authority to set sentencing. Set sentencing. Unless the panel has any other questions, I'll resume myself. No further questions. Thank you. Thank you, counsel. Mr. Tipp. You have about four minutes. Thank you, Your Honor. I do need to give Mr. Bewley some additional time, so I want to, if I can, quickly address some of the issues raised by the Court and Mr. Thaggart in his response. This imputed knowledge issue. The government's argument seems to be that Cook had imputed knowledge of what McCarville knew because certainly he'd been present when McCarville was at the Northwest Drug Task Force as well. Well, first of all, no evidence of that. We don't know when McCarville went to the Northwest Drug Task Force. We know he was there from the warrants after the fact sometime in December and January, because information regarding his work there is contained, in fact, in the warrant application. Is there any evidence of how big it was and how often they met and what kind of communication there was among the members? Absolutely not. Absolutely not. And I think that was one of the important issues in Bernard. If you take a look at Bernard, you have the first officer who has a whole bunch of information Frederick gets. First officer is Frederick. He obtains a whole bunch of information regarding an informant's tip, corroborating surveillance, which we don't have here, knowledge that Bernard and his associates were suspicious when they were buying chemicals, a whole bunch of other events. And the court still said, this court still said, that's not enough. That raises to a level of reasonable suspicion, but that's not enough. However, in that particular case, Frederick's relied upon the further opinion of this officer Lackey. Now, Officer Lackey and Frederick, in that particular case, conversed for what the court terms to be an hour, half an hour, regarding what was going on. And even though Lackey didn't tell Frederick, you know, I have this additional information, he did give Frederick his opinion that they had enough to make the arrest. So you have a long period of time of discussion. You have a lot of corroborated information that Frederick has in the first place, coupled with the opinion of Lackey in imputing then all the knowledge Lackey had. You have no evidence in this case making the connection between McCarville and Meehan at the time of the arrest, and similarly between McCarville and Cook at the time of arrest. That is absolutely critical, I think, in this particular case. And I think perhaps, again, the court really needs to consider that neither of these experienced officers, although they're from a small town, nevertheless, they are experienced officers. Neither of them for a moment considered that they had sufficient probable cause to make a narcotics arrest, ever. I think that is probably the most cogent piece of evidence that we have in this case. Is that the standard? That's not the standard. Okay. But I think it does tell the court as far as, you know, what information they did have at the time they made the arrest. Certainly, their basis of knowledge of drug trafficking and making arrests and getting warrants would come into play there. I think that's something the court could consider. But that is not the standard. I understand that. I do want to defer now to Mr. Buehler to raise Meehan. We've only got about half a minute, Mr. Buehler. Sorry. Yeah, that's good. Hopefully it will be enough. As to the point raised by Mr. Thagard about this being a charging issue, it is not a charging issue. It never was. He was always charged under 841. The 851 information arose after the charging, and he was convicted of 841. This is a discretionary document filed by the United States Attorney General pursuant to Attorney General Ashcroft's direction for no reason other than to exercise the power that Congress gave him. There was nothing other than Attorney General Ashcroft's memo to the United States Attorney General that prompted the filing of the 851 information after Mr. Jensen had already been charged. So this is not discretionary charging, as Mr. Thagard says. It's discretionary sentencing made mandatory to the judge, which makes the judge nothing more at sentencing other than a clerk. That's the issue here. Thank you, counsel. The case just argued will be submitted for decision, and the court will adjourn. Thank you.
judges: O'scannlain, McKeown, Bea